# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

CHRIS HANNIBAL and LEANNA HANNIBAL,　　　　　　　　　　　　　　PLAINTIFFS
Individually and as Co-Personal Representatives
of the Estate of Krista Sue Hannibal, Deceased

v.　　　　　　　　　　　　　　No. 4:16CV00904 JLH

TRW VEHICLE SAFETY SYSTEMS, INC.　　　　　　　　　　　　　　　　DEFENDANT

## OPINION AND ORDER

Krista Hannibal was killed when her 1997 Ford Explorer, which she was driving, left the road and rolled over in a deep ditch shortly after 5:00 p.m., on November 26, 2007. The Explorer came to rest upside down at an angle tilted toward the driver's side. Krista was partially ejected through the window on the driver-side door and her head was pinned between the top of the door frame and a rock on the ground. Her parents brought this action against TRW Vehicle Safety Systems, Inc., which manufactured components of the seatbelt system, contending that the seatbelt system was defective and unreasonably dangerous. Their theory was that, due to a design defect, during a rollover the locking mechanism would permit enough of the webbing to unspool to allow Krista's head to get outside the window. The case was submitted on interrogatories with the first interrogatory asking whether Krista was wearing her seatbelt at the time of the accident. The jury answered that interrogatory "No."

The plaintiffs have now filed a motion for new trial, contending that the Court erred in allowing the investigating officer, Derek McGuire, to testify that it did not appear that Krista was wearing her seatbelt at the time of the accident. They also assert that the Court erred in allowing Charles Davidson, a fireman and emergency medical technician, to testify on that issue.

Four eyewitnesses testified at trial on the issue of whether Krista was wearing her seatbelt. All of them were permitted to testify as to what they saw and what conclusions they drew based upon what they saw.

The first witness was Josh Ramsey. Ramsey was working on a water line near the scene of the accident when it occurred. He and his co-worker, Terry White, ran to the scene immediately after the accident occurred. Ramsey looked through the passenger-side rear door. He testified as follows:

> Q    Okay. When you got that passenger door open or were looking through that passenger side, could you see Krista in the vehicle at that point?
>
> A    Yes, from the side.
>
> Q    Okay. Can you explain how you saw her positioned in the vehicle?
>
> A    The vehicle was – the vehicle was upside down. I believe I was looking in from the back passenger door and I could see the side of the – the side of the seat and the side of her – and her hair, and she was upside down in the driver's seat.
>
> Q    Okay. Did you see her face?
>
> A    I could only see hair and like shoulder down to the seat. Like I said, she was – she was just hanging upside down in the driver's seat.
>
> Q    Was she behind the steering wheel?
>
> A    That is correct.
>
> Q    Do you remember which way she was orientated in that seat?
>
> A    What do you mean by that?
>
> Q    When you describe her as behind the steering wheel, would that be in the same manner that someone would be behind the steering wheel of a vehicle that was not flipped upside down?
>
> A    Yes.

> Q   Do you know any other way that she could have been hanging upside down other than wearing a seat belt?
>
> A   I really don't know what to say here because I don't want to speculate anything. I don't see any other way for her to have been in that position if she didn't have one on, if I can say that.
>
> Q   Did you make any effort to look for a seat belt when you were looking into that vehicle?
>
> A   No, I did not.

Page 60, line 3 through page 61, lines 1, 20-23, and page 62, lines 2-4. Document #123 at 60-62.

> Q   Mr. Ramsey, you don't recall seeing the seat belt, true?
>
> A   Correct.
>
> Q   You didn't see the belt on her, true?
>
> A   Correct.
>
> Q   You personally did not touch a seat belt, correct?
>
> A   No. I didn't touch anything inside the vehicle.
>
> Q   And you didn't see anybody else take the seat belt off her, correct?
>
> A   Correct. Once emergency personnel started doing their job, I didn't want to interfere and backed away.

Page 79, lines 2-11. Document #123 at 79.

> Q   You could not confirm or deny that the seat belt was on or off, true?
>
> A   Correct.

Page 86, lines 14-16. Document #123 at 86.

Terry White entered the vehicle through the hatch. He crawled and placed his head between the driver-side seat and the passenger-side seat, expecting to find that the occupant was alive. When

3

Krista did not respond, he backed out and waited for the emergency professionals to arrive. White testified:

> Q   Did you see anything that would have kept her in that upside-down position?
>
> A   No.
>
> Q   Do you have any explanation of how she would have still been in that position in the seat?
>
> A   I don't. I mean, I didn't – she was just in there.
>
> Q   You weren't looking for a seat belt?
>
> A   No, I wasn't.

Page 7, line 21 through page 8, line 3. Document #121 at 7-8.

> Q   Next you don't remember seeing a seat belt at all, true?
>
> A   True.
>
> Q   You did not – certainly did not unfasten or unbuckle a seat belt, true?
>
> A   No, because, when I didn't get any response, I was thinking neck injury. I don't –
>
> Q   You knew better than to touch –
>
> A   Right.
>
> Q   – somebody who was injured?
>
> A   Right.
>
> Q   So true statement, did not unfasten or unbuckle the belt?
>
> A   No.
>
> Q   True?
>
> A   True.
>
> \* \* \*

4

> Q    You did not see anybody unbuckle that seat belt?
>
> A    No.
>
> Q    True?
>
> A    True.
>
> Q    All right. The seat belt was not in your way at all, true?
>
> A    True.
>
> Q    Granted, you only got up far enough to put your head up through between the two seats and look over, right?
>
> A    Right.
>
> Q    And the last one is you didn't see anyone else in that vehicle until the firemen arrived, true?
>
> A    True.

Page 16, line 14 through page 17, line 18. Document #121 at 16-17.

Charles Davidson and Derek McGuire both arrived within minutes after the accident occurred. Like White, Davidson crawled into the vehicle through the hatch. Persons on the outside rocked the vehicle to release the pressure on Krista's head, which allowed Davidson to pull her head back inside. Davidson then pulled her body out the back of the vehicle. As to the issue of whether she was wearing a seatbelt, Davidson testified by deposition[1] as follows:

> Q    Do you remember when you were trying to assist her as far as getting her – her head out of the – out of the water, if she had a seatbelt on?
>
> A    I – I do not recall unbuckling a seatbelt or cutting a seatbelt at all, so ...
>
> Q    Do you recall seeing the seatbelt around her in any place?

---

[1] The plaintiffs' objections to this deposition testimony and the Court's rulings are at Document #114.

5

>       A       I do not.
>
>       Q       Okay. Do you recall seeing the seatbelt anyplace in the vehicle?
>
>       A       No. I mean, I did – I did not personally – I was in the vehicle. I did not personally touch the seatbelt, so I don't recall –
>
>       Q       Okay.
>
>       A       – anything about it. And that's not something I was looking for.
>
>       Q       Sure. But the seatbelt wasn't in your way as far as when you're trying to assist her –
>
>       A       No.

Page 24, line 25 through page 25, line 18. Document #98-2 at 12-13.

>       Q       ... Do you carry a seatbelt cutting tool with you or do you carry a knife or what do you usually use to cut a seatbelt?
>
>       A       I – sometimes I carry a knife; sometimes I don't. I don't have a seatbelt cutting tool, no. If I don't have one, usually somebody like Captain Middleton or somebody will have one.
>
>       Q       Okay.
>
>       A       That's what I'd have used. I would either have – I don't remember if I had mine that day, but if I didn't, I'd have got his or something.
>
>       Q       Okay. And you don't recall cutting the seatbelt or unbuckling the seatbelt; is that correct?
>
>       A       Yes, I don't recall doing that – any of that.

Page 35, lines 11-25. Document #98-2 at 17-18.

>       Q       Okay. Do you have any recollection one way or the other, sir, of whether or not you unbuckled Ms. Hannibal's seatbelt?
>
>       A       I – I know for a fact that I did not unbuckle her seatbelt.
>
>       Q       Okay. Well, do you know for a fact one way or the other as to whether or not her seatbelt was buckled at the time that the rollover event began?

A I do not know that.

Q Do you know, sir, one way or the other whether or not her seatbelt was buckled prior to your getting to her?

A I – I do not know that.

Page 40, line 25 through page 41, line 12. Document #98-2 at 20.

On the issue of whether Krista was wearing her seatbelt, McGuire testified by deposition[2]:

Q Okay. And you're familiar with seatbelts and how they operate and –

A Yes, sir.

Q – retract up into certain positions, are you?

A Yes, sir.

Q Where is the seatbelt located, her safety belt located?

A It's –

Q In terms of pillars.

A It's tied to the B pillar.

Q Okay. As you're looking through the passenger window at the scene, Ms. Hannibal on the driver's side as you described her, did you see a seatbelt on or around her?

A I do not recall.

Q Okay. At any time did you ever, yourself, take a seatbelt off of her?

A No.

Q Are you sure of that?

A Yes. I was never in the vehicle with her.

---

[2] The plaintiffs' objections to this deposition testimony and the Court's rulings are at Documents #100 and #112.

Q    Okay. So you couldn't have taken the seatbelt off her?

A    Correct.

Q    Did you at any time observe a seatbelt in its basic stowed position in the vehicle?

A    I do not recall.

Q    Okay. Do you recall anyone else taking a seatbelt off Ms. Hannibal?

A    No, sir.

Q    Do you recall anyone else stowing the seatbelt from Ms. Hannibal?

A    No, sir.

Q    While you were there at any time observing Ms. Hannibal as you were on the passenger side looking into the driver's side, do you recall anyone ever using any type of knife or cutting device to cut the seatbelt away?

A    No, sir.

Q    Okay. Looking at the report, if you don't mind, there is a reference in your narrative – feel free to read the whole narrative. I think you have.

A    Yes, sir.

Q    Did you make any reference as to what you thought at that time while you were preparing the report in terms of Ms. Hannibal wearing a seatbelt or not?

A    Yes. I stated Ms. Hannibal did not appear to have been wearing a seatbelt at the time of the accident.

Q    Why did you state that?

A    Looking in the vehicle, I didn't see it snapped in. I didn't – didn't see that.

Q    Okay. By "snapped in," I think I know what you mean, but would you tell the jury exactly what you mean when you say "snapped in" –

A    When you place your seatbelt on, you click it into the receiver.

Q    Okay. And looking in – into the vehicle, you did not see that?

A That's correct.

Q And you're secure about that?

A Yes, sir.

Page 24, line 22 through page 27, line 8. Document #98-8 at 12-13.

Q Okay. Do you know if there are – regardless of whether you've done that or seen that, do you know whether or not – just based upon your knowledge and training and experience, any type of cutting devices that are used in that situation?

A A lot of officers carry pocket knives with them. I mean, if I had to do that, I would – I would have used the pocket knife that I carry at the time. But only – I would never do that unless the situation was worsening to a life-threatening measure. I mean, we're trained to – if it's possible to leave the person in whatever position there is, that's the best scenario until much more trained people arrive.

Q And once again, did you do any cutting here in terms of Ms. Hannibal?

A No.

Q Or see anybody else do any type of cutting?

A No.

Q I mean of the seatbelt.

A Correct, no, I did not.

Page 33, line 24 through page 34, line 19. Document #98-8 at 17.

Q And did you get in this vehicle, sir, with her to look to determine whether or not she had a seatbelt on?

A No, sir.

Q And was it dark when you got there?

A It was – the accident was [at] 5:15, so it would have been light still at that point.

Q Okay. Did you go to any concerted effort, sir, to determine whether or not she did, in fact, have a seatbelt on or not?

9

A   No, sir.

Q   So to the extent that you didn't see that she had her seatbelt on, you also didn't see whether or not she had it off?

A   Correct.

Page 43, line 5 through line 19. Document #98-8 at 21.

Q   Now, in terms of your position in this police report or the accident investigation report that she was not wearing a seatbelt, you don't know one way or the other whether or not she was or wasn't wearing a belt; is that true?

A   That was my opinion at the time.

Q   Okay. And that was based upon not seeing it?

A   Correct.

Q   On her?

A   Correct.

Q   But you also don't know that you – it wasn't on her and you just didn't notice it?

A   I don't recall seeing it on her. I don't know what happened prior to my arrival, if whoever was in the car did something to the seatbelt that – I couldn't know that.

Q   Okay. But can you testify under oath, sir, that it was definitively not on her, as opposed to you just not seeing it on her?

A   I – I don't recall seeing the seatbelt.

Q   Either way, on her or not on her?

A   I don't remember seeing it on her.

Q   Do you remember seeing it off of her?

A   If it was in its normal position, I probably wouldn't have noticed it.

Q   Okay. And you didn't get in the vehicle to determine whether or not it was on her?

> A    Correct.

Page 48, line 1 through page 49, line 5. Document #98-8 at 23-24.

In ruling on a motion for new trial, "[t]he key question is whether a new trial should [be] granted to avoid a miscarriage of justice." *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1400 (8th Cir. 1994). An allegedly erroneous evidentiary ruling does not warrant a new trial unless the ruling was so prejudicial that a new trial likely would produce a different result. *Townsend v. Bayer Corp.*, 774 F.3d 446, 461 (8th Cir. 2014); *Harrison v. Purdy Bros. Trucking Co., Inc.*, 312 F.3d 346, 351 (8th Cir. 2002).

Contrary to the plaintiffs' argument, McGuire did not testify as an expert on seatbelt use. He offered lay testimony based on Rules 602 and 701. Federal Rule of Evidence 602 provides that a lay witness may testify only as to matters as to which the witness has personal knowledge. Rule 701 provides that a lay witness can testify in the form of an opinion if the opinion is rationally based on the witness's perception, helpful to understand clearly the witness's testimony or determine a fact in issue, and is not based on scientific, technical, or other specialized knowledge.

McGuire stated in his report and testified in his videotaped deposition that it did not appear that Krista was wearing a seatbelt at the time of the accident. That testimony was based on his personal observations made when he arrived at the scene within minutes after the accident occurred. He did not see a seatbelt around Krista. He did not unbuckle the seatbelt or cut it. He did not observe anyone unbuckle it or cut it. He believes that if she had been wearing a seatbelt that he would have seen it. His opinion at the time was that she was not wearing a seatbelt and that opinion was based on not seeing it. He could not definitively say that she was not wearing the seatbelt at the time of the accident because he did not know what happened prior to his arrival—whether someone else had entered the vehicle and did something to the seatbelt. He testified that if Krista

11

was not wearing the seatbelt, and if the seatbelt was in its normal position, he probably would not have noticed it. This testimony forms a rational basis for McGuire's testimony that he did not believe that Krista was wearing her seatbelt at the time of the accident. His only caveat was that he did not know whether someone had unbuckled or cut the seatbelt before he arrived. The evidence established that only two persons went into the vehicle—Terry White and Charles Davidson—and both testified that they did not unbuckle or cut the seatbelt. Admitting McGuire's testimony that it did not appear that Krista was wearing her seatbelt when the accident occurred was not error.

In a reply brief, the plaintiffs suggest that the ruling allowing McGuire to testify as to whether Krista was wearing a seatbelt conflicts with the Court's ruling that he could not testify as to the cause of the rollover accident. The difference is that McGuire's testimony as to the cause of the rollover accident was based on hearsay, i.e., descriptions of the event provided by persons who saw the rollover accident happen, not on McGuire's personal observations. Because McGuire was not a rollover accident expert and because his opinion as to the cause of the rollover was not based upon his own observations, he could not testify to that opinion under Rule 701. In contrast, his testimony that it did not appear that Krista was wearing her seatbelt was based on his own observations.

The plaintiffs assert that the Court erred in allowing Davidson to testify that he did not see the seatbelt. They say it was speculative because he was not looking for a seatbelt. *See* Documents #145 and #150. Davidson testified as to what he personally observed. Admitting Davidson's testimony was not error.

Furthermore, excluding McGuire's testimony that it did not appear that Krista was wearing her seatbelt would not produce a different result in a new trial. As noted, four eyewitnesses testified regarding what happened at the scene after the rollover occurred. None of them saw a seatbelt.

None of them unbuckled a seatbelt. None of them cut a seatbelt. No one other than Davidson and White entered the vehicle. Davidson pulled Krista's body from the driver's seat over the roof and out the rear hatch without unbuckling or cutting a seatbelt and without anyone else unbuckling or cutting a seatbelt, which would have been impossible if she had been wearing her seatbelt. Photographs of the interior of the vehicle taken while it was still in the ditch and immediately after it was pulled out show the seatbelt in a stowed position with a floor mat lying on top of it, which is strong evidence that the seatbelt was in a stowed position when the vehicle rolled over. In addition, the evidence established that if Krista had been wearing her seatbelt the force exerted by her body being thrust suddenly against it by the impact of the accident would have left marks (or "loading") on the seatbelt, but such marks were not found. In light of the totality of the evidence, granting a new trial and excluding McGuire's statement that it did not appear that Krista was wearing her seatbelt at the time of the accident, and Davidson's statement that he did not see a seatbelt, would not produce a different result.

The motion for new trial is DENIED. Document #145.

IT IS SO ORDERED this 13th day of November, 2018.

                                                             _____
                                                             J. LEON HOLMES
                                                             UNITED STATES DISTRICT JUDGE